IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

MEKELL WHATLEY

CRIMINAL ACTION NO.
1:22-CR-296-1-LMM

## SENTENCING MEMORANDUM FOR MEKELL WHATLEY

Mr. Whatley will refrain from recommending a specific sentence until after the Court has ruled on his legal objection and calculated his final guidelines range. Here, he describes aspects of his background that bear on the statutory sentencing factors, a variance request that he expects the government not to oppose, and the reasons his objection should be sustained.

I.    **Mr. Whatley's personal experiences with violence and his related substance use.**

Mekell Whatley has lived with the specter of physical violence against him and his loved ones from a young age. His father was murdered in his childhood, he himself was shot at age 20, and he has seen friends and neighbors shot in the street or stabbed in jail. After he was shot, he began abusing the prescription drugs he received for the pain. He urges the Court

1

to consider how these experiences have shaped him when it imposes sentence.

Mr. Whatley was raised primarily by his mother and stepfather. Though he never lived with his birth father, his father would pay visits to Mr. Whatley and his siblings. When his father would visit, Mr. Whatley remembers him being the "fun parent," in contrast to his disciplinarian mother, taking Mr. Whatley and his siblings shopping or to water parks. All of this was cut short when his father was murdered. Mr. Whatley was nine years old at the time—he learned of the killing from his mother but was forced to see it on the news after that.

Mr. Whatley would come to see violence touch so many people close to him that he regarded it as an ever-present threat. In 2016, Mr. Whatley was at a gas station with friends when gunshots rang out. He dragged his younger cousin into the store to get him out of harm's way. After the commotion ended, Mr. Whatley saw that one of his friends had been shot, but fortunately would survive. A different cousin of Mr. Whatley's has been shot on multiple occasions, including in Mr. Whatley's presence. In 2018 Mr. Whatley watched a known drug addict from the neighborhood chase Mr. Whatley's friend while brandishing a knife. The man stabbed Mr.

Whatley's friend and tried to straddle the friend before Mr. Whatley kicked the man off his friend.

At age 20, Mr. Whatley became a shooting victim himself. He was shot by an acquaintance while Mr. Whatley was trying to keep the person from going off with a gun to settle a score. Counsel received medical records from his treatment at Grady Hospital, which show that he arrived at the hospital with the gunshot wound, coughing up blood. He was shot in the chest and the bullet came to rest in his buttocks after puncturing his bowel. Fortunately, there was no serious impairment of his organ function. He received trauma surgery and follow-up care and was discharged three weeks later. The records also show that he was prescribed Percocet for his pain from the injury.

After first taking these painkillers as prescribed, Mr. Whatley developed a dependency that continued through the time of his arrest. As the PSR recounts, he became addicted to the Percocet and was taking the substance daily." (PSR ¶ 61). As he explained during the PSR interview, things got to a point where he would take these kind of pills every morning—"it became a need."

Mr. Whatley recognizes that the offense conduct in this case involves

3

more than simply carrying a gun in a dangerous neighborhood after a previous felony conviction. Nonetheless, the ways he came to expect violence to creep into his daily life, and his use of painkillers to cope with his day-to-day experiences, bear on the blameworthiness of his actions in this case.

The time Mr. Whatley has spent in jail since 2022 has afforded him a long period of sobriety and an opportunity for reflection. Most importantly, he has seen that nothing good can come for him or his family if he is in jail instead of with them. He has racing thoughts and difficulty sleeping. He saw a neighbor of his and another inmate stabbed in separate incidents at Fulton County Jail. He does not want to return to living the way he was before his arrest. Instead, he hopes to move with his partner and his children to a new city and a community where he will not live under the daily fear of violence.

## II.   The Court should vary downwards to give effect to a forthcoming guidelines amendment to the treatment of "status points" in the criminal history score.

One of the U.S. Sentencing Commission's recently adopted amendments to the guidelines, which will likely take effect on November 1st, would change Mr. Whatley's guidelines range. He asks the Court to

vary downwards to account for this change, in effect treating him as if he were being sentenced on November 1st instead of now. He expects that the government will not object to this request.

One of the adopted amendments scales back the effect of "status points" in calculating a defendant's criminal history score. Under current rules, a defendant who committed their federal offense "while under any criminal justice sentence, including probation," receives two criminal history points as a result. USSG §4A1.1(d). But this provision is not doing what it is supposed to: predicting recidivism. Indeed, the Sentencing Commission's own study revealed this: "[T]he Commission [has] found . . . that status points add little to the overall predictive value associated with the criminal history score."[1] The adopted amendment, then, provides this change:

> Add 1 point if the defendant (1) receives 7 or more points under subsections (a) through (d), and (2) committed the instant

---

[1] U.S. Sent'g Comm'n, Amendments to the Sentencing Guidelines, 78, April 27, 2023, available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf (citing U.S. Sent'g Comm'n, Revisiting Status Points (2022), available at https://www.ussc.gov/research/research-reports/revisiting-status-points).

offense while under any criminal justice sentence, including probation . . . .

*Id.* at 82.

If Mr. Whatley were sentenced after this proposed amendment goes into effect, he would find himself in a lower criminal history category. He has three criminal history points based on the counting of his prior convictions. (PSR ¶ 38). Thus, no status points would be applied under the proposed amendment. As a result, he would fall into Criminal History Category II. By contrast, the PSR places him in Category III after two status points are added for him being on probation at the time of the instant offense. *Id.* at ¶¶ 39, 40.

The Court should vary downward to sentence Mr. Whatley as if he were being sentenced under this adopted amendment. The Sentencing Commission's own evaluation of data suggests that the existing status point provision does not well serve the goal of predicting recidivism. Neither, by extension, does it serve the statutory sentencing purposes aimed at reducing the risk of recidivism — deterring criminal conduct and protecting the public from further crimes of the defendant, 18 U.S.C. § 3553(a)(2)(B), (C). On top of this, sentencing Mr. Whatley under the current

6

provision would create unwarranted disparities between him and people situated similarly except for having the good fortune of a sentencing date on or after November 1st. The statutory sentencing factors thus favor varying from the guidelines to sentence Mr. Whatley under the adopted amendment. As a result, his range would be 78 to 97 months of imprisonment.

III. **Mr. Whatley's Georgia state convictions for Possession with Intent to Distribute Marijuana are not controlled substance offenses under § 2K2.1 of the Guidelines because the Georgia statute criminalizes substances not controlled by federal law.**

Mr. Whatley objects to the PSR's conclusion that a base offense level of 22 should apply. (PSR ¶ 23). His Georgia First Offender adjudication for possession with the intent to distribute marijuana is not a "controlled substance offense" under the guidelines because Georgia's definition of "marijuana" criminalizes substances not controlled by federal law.[2] Mr. Whatley's base offense level should instead be 20, based on him possessing a firearm with a large capacity magazine.

Because the government bears the burden of establishing that a

---

[2] Mr. Whatley also objected to a base offense level of 22 on the ground that this First Offender adjudication was not a "felony conviction" within the meaning of §2K2.1. He now withdraws that basis for the objection.

sentencing enhancement applies, it must prove that a state conviction qualifies as a controlled substance offense under the guidelines. *United States v. Hernandez*, 145 F.3d 1433, 1440 (11th Cir. 1998). Additionally, courts must use the categorical approach to evaluate whether a state conviction is a guidelines controlled substance offense. *Hollis v. United States*, 958 F.3d 1120, 1123 (11th Cir. 2020) (citing *Shular v. United States*, 140 S. Ct. 779, 783 (2020)).

Under the categorical approach, a court must "consider only the fact of the prior conviction and the elements of the offense, not the particular facts of the defendant's crime." *Id.* If the state prior conviction requires proof of the same elements as the predicate definition, then it is a predicate offense. *Id.* (citing *Descamps v. United States*, 570 U.S. 254, 260–61 (2013)). However, when the state statute criminalizes conduct that the predicate definition does not, the state conviction does not qualify as a predicate offense.

A "controlled substance offense" is defined as:

> an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the … possession of a controlled substance … with intent to manufacture, import, export, distribute, or dispense.

8

U.S.S.G. § 4B1.2(b).

This definition does not expressly define "controlled substance" by referencing 21 U.S.C. 802 or a comparable federal analog. Further, the Eleventh Circuit has not decided in a published opinion which "controlled substance" comparator—federal or state—is used under the guidelines.

There is a circuit split on this issue, and this Court should join the Second, Fifth, Ninth, and Tenth Circuits, which agree that "controlled substance" should be defined using the *federal* analog, i.e., the Controlled Substances Act ("CSA"), 21 U.S.C. § 801 et seq. The Ninth Circuit has interpreted "controlled substance" within the Guidelines "to mean a substance listed in the Controlled Substances Act.…[Because] construing the phrase in the Guidelines to refer to…the CSA—rather than to the varying definitions of 'controlled substance' in the different states—furthers uniform application of federal sentencing law." *United States v. Bautista*, 989 F.3d 698, 705 (9th Cir. 2021).

The Second, Fifth, and Tenth Circuits have reached the same conclusion. The Fifth Circuit "adopt[ed] the reasoning of the Ninth Circuit," and held that "[f]or a prior conviction to qualify as a 'drug

trafficking offense[3],' the government must establish that the substance underlying that conviction is covered by the CSA." *United States v. Gomez-Alvarez*, 781 F.3d 787, 794 (5th Cir. 2015). *See also United States v. Townsend*, 897 F.3d 66, 68 (2d Cir. 2018) (holding that the guidelines' reference to "'controlled substance' refers exclusively to substances controlled by the CSA"); *United States v. Abdeljawad*, 794 Fed. Appx. 745, 748 (10th Cir. 2019) (finding that the legal definition of "controlled substance" comes from the CSA).

Thus, if the Court finds that the definition of "controlled substance" is based on 21 U.S.C. § 802, there must be a categorical match between the substances prohibited by the state statute of conviction and the Controlled Substances Act for an enhancement to apply under the Guidelines. *See Mellouli v. Lynch*, 575 U.S. 798, 801 (2015) (holding that a state conviction must involve a federally-controlled substance in order to qualify as a violation of law "relating to a controlled substance (as defined in section

---

[3] The Fifth Circuit was interpreting the term "drug trafficking offense" from the then-existing Section 2L1.2 of the guidelines, but its analysis focused on what to make of the guidelines' use of the term "controlled substance" in a definition of a predicate offense, the same term that appears in Section 4B1.2's "controlled substance offense" definition.

802 of title 21)"); *see also US v. Bautista*, 982 F.3d 563, 568 (9th Cir. 2020) ("A state drug statute is therefore categorically overbroad if it includes substances other than those listed in the federal CSA.").

Even assuming a state statute prohibits the same type of *conduct* named in the federal definition (*e.g.*, manufacturing, distributing, possessing with intent), it can only qualify as a controlled substance if it also necessarily involves a *federally* controlled substance. Thus, a state statute will be overbroad if it includes substances that are not on the federal schedule, or if it defines any individual controlled substance more expansively than the corresponding federal definition. Therefore, in the instant case, "marijuana" under Georgia law must be a categorical match—equal to or narrower than—"marihuana" under federal law.

Mr. Whatley was adjudicated as a First Offender for possession of marijuana with intent to distribute under state law in Clayton County, Georgia, in 2016. Therefore, we must compare the language of the Georgia statute at the time of his state conviction to the language of the federal statute at the time of his state conviction. *See United States v. Jackson*, 55 F.4th 846, 855 (2022), *cert. granted* 143 S. Ct. 2457 (May 15, 2023) (Armed Career Criminal Act context).

At the time of Mr. Whatley's conviction, Georgia defined "marijuana" as follows:

> "Marijuana" means all parts of the plant *of the genus Cannabis*, whether growing or not, the seeds thereof, the resin extracted from any part of such plant, and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds, or resin, but shall not include samples as described in subparagraph (P) of paragraph (3) of Code Section 16-13-25 and shall not include *the completely defoliated mature stalks* of such plant, fiber produced from such stalks, oil, or cake, or the completely sterilized samples of seeds of the plant which are incapable of germination.

O.C.G.A. § 16-13-21(16) (effective July 1, 2011 – May 9, 2019) (emphasis added).

At the time of Mr. Whatley's state conviction, the federal government defined "marihuana" as follows:

> The term "marihuana" means all parts *of the plant Cannabis sativa L.*, whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin. Such term does not include *the mature stalks* of such plant, fiber produced from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture, or preparation of such mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of such plant which is incapable of germination.

21 U.S.C. § 802(16) (effective April 15, 2009 – October 23, 2018) (emphasis added).

12

The Georgia and federal definitions of marijuana are a categorical mismatch. The state's definition is more expansive than the federal definition in two ways. First, the state defines marijuana as any plant in the *Cannabis* genus, yet the federal government's definition is limited to a single species within that genus, *Cannabis sativa* L., so Georgia's taxonomy encompasses a broader range of substances. Second, the two definitions offer disparate treatments of the plant's "mature stalks." Because Georgia criminalizes a broader range of substances than the federal government, a marijuana conviction in Georgia is categorically excluded from the guidelines' drug predicate definition.

A. <u>Georgia's marijuana definition is broader than the federal definition because it controls the genus *Cannabis*, while the federal government controls only the species *Cannabis sativa* L., which is one of three species within that wider *Cannabis* genus.</u>

Georgia defines "marijuana" as "all parts of the plant of the genus *Cannabis*," but the federal government defines "marihuana" as "all parts of the plant *Cannabis sativa* L." *Compare* O.C.G.A. § 16-13-21(16) and 21 U.S.C. § 802(16).

According to plant biologists, the Cannabaceae family tree has one genus with multiple species: *Cannabis* is the genus, and *Cannabis sativa* L. is one of the three species within that genus. Over the years, some biologists have argued that *Cannabis* is a genus with only one species (*sativa* L.); that is, they are biologically the same. Now, however, biologists and experts agree that there are three species, only one of which is *sativa* (the other two species are *indica* and *ruderalis*).[4]



Therefore, the Georgia definition of marijuana sweeps more broadly than the federal definition because under Georgia law, *all* plants in the

---

[4] "The genus *Cannabis* has been divided into three main species: a fibre-type one, named *C. sativa* L., a drug-type one, characterized by high levels of the psychoactive compound $\Delta^9$-tetrahydrocannabinol ($\Delta^9$-THC), named *C. indica* Lam., and another one with intermediate properties, named *C. ruderalis* Janisch." Federica Pellati, Vittoria Borgonetti, Virginia Brighenti, Marco Biagi, Stefania Benvenuti, and Lorenzo Corsi, *Cannabis sativa L. and Nonpsychoactive Cannabinoids: Their Chemistry and Role against Oxidative Stress, Inflammation, and Cancer*, National Library of Medicine, National Center for Biotechnology Information (December 4, 2018), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6304621/ (last visited July 13, 2023).

genus are illegal, but under federal law, *only sativa* plants (not *indica* or *ruderalis* plants) are illegal.

In fact, the Georgia legislature clearly intended to define marijuana broadly. The Georgia Code defines marijuana and hemp using the distinction described previously: marijuana is defined with reference to the *Cannabis* genus, while hemp is described with specific reference to the *sativa* species. *Compare* O.C.G.A. § 16-13-21(16) ("all parts of the plant of the genus *Cannabis*") *and* O.C.G.A. § 16-13-25(3)(P) ("the external morphological features of the plant of the genus *Cannabis*"); *with* O.C.G.A. § 2-23-3(5) ("'Hemp' means the *Cannabis sativa* L. plant").

Under Georgia law then, *Cannabis* and *Cannabis sativa* L. are not equivalent. When a state legislature explicitly chooses one term over the other we must presume it "said what it meant and meant what it said." *US v. Strickland*, 261 F.3d 1271, 1274 (11th Cir. 2001). Therefore, because the Georgia statute criminalizes all parts of the plant of the genus *Cannabis*, and the federal statute only criminalizes *Cannabis sativa* L., the Georgia statute is overbroad and Mr. Whatley's Georgia state marijuana conviction cannot be used as predicate for sentencing enhancement under the Guidelines.

B. <u>Georgia's marijuana definition is broader than the federal definition because it controls the completely defoliated mature stalks of the plant, while the federal government controls only the mature stalks of the plant.</u>

There is a second determinative difference between the Georgia and federal definitions of marijuana: The federal definition excludes "the mature stalks of such plant," but the Georgia statute excludes only a subset of that category: "the *completely defoliated* mature stalks of such plant." *Compare* 21 U.S.C. § 802(16)(B)(ii) and O.C.G.A. § 16-13-21(16) (emphasis added). Put another way, under Georgia law, a *non-defoliated* mature stalk (*i.e.*, one with the leaves still intact) is marijuana, but under federal law, it is not. In this way, the Georgia definition is broader than the federal definition.

Congress does not define the difference between a mature stalk that is "completely defoliated" and one that is not. In fact, 18 U.S.C. § 802 does not use "stalk" outside of the marijuana definition, and it does not use "defoliated" anywhere at all. Additionally, neither the United States Code nor the Code of Federal Regulations provides no definition of either "stalk" or "defoliated". Therefore, we look to the common usage of both words.

The Merriam-Webster Dictionary defines "stalk" as:

16

> 1:     a slender upright object or supporting or connecting part, especially: PEDUNCLE;
> 2a:    the main stem of an herbaceous plant often *with its dependent parts*;
> 2b:    a part of a plant (such as a petiole or stipe) that supports another."[5]

Under 2a, "stalk" includes not only the main stem, but also "its dependent parts," which can only mean branches, offshoots, and leaves. This is even more obvious given the dictionary definition of "peduncle": "a stalk bearing a flower or flower cluster or a fructification; a narrow part by which some larger part or the whole body of an organism is attached."[6] In the end, a "mature stalk" is a unitary whole that includes the stem, plus its branches, offshoots, and leaves.

Again, Congress chose to exempt all "mature stalks" of the plant from criminalization, while Georgia only exempted a subset of stalks, those that have been "completely defoliated." This was another conscious choice

---

[5] *Stalk*, MERRIAM-WEBSTER DICTIONARY, available at https://www.merriam-webster.com/dictionary/stalk (last visited July 14, 2023) (emphasis added). The dictionary defines "defoliate" this way: "to deprive of leaves especially prematurely." *Defoliate*, MERRIAM-WEBSTER DICTIONARY, available at https://www.merriam-webster.com/dictionary/defoliated (last visited July 14, 2023).

[6] *Peduncle*, MERRIAM-WEBSTER DICTIONARY, available at https://www.merriam-webster.com/dictionary/peduncle (last visited July 14, 2023).

on the part of the Georgia legislature. In May 2019, the Georgia legislature adopted the federal definition of marijuana in the federal Farm Bill nearly verbatim, and yet it chose to set apart its own completely defoliated mature stalk exemption. (*See* O.C.G.A. § 16-13-21(16)). Therefore, the Georgia legislature intended to criminalize more conduct than is criminalized under the federal Controlled Substances Act.

The Eleventh Circuit recently addressed a similar argument against the Florida marijuana statute. In *Said v. U.S. Atty. General*, an immigration case, the panel found that a Florida conviction for marijuana under Fla. Stat. § 893.13(6)(a) is not a categorical match to a "controlled substance as defined in 21 U.S.C. § 802," since the Florida marijuana definition includes the mature stalks of the plant and fiber produced from such stalks, while the federal definition does not. 28 F.4th 1328, 1332 (11th Cir. 2022). *See also US v. Latson*, No. 19-14934, 2022 WL 3356390 (11th Cir. Aug. 15, 2022) (unpublished) (reversing an Armed Career Criminal Act sentence based on the Florida-federal marijuana disparity identified in *Said*). Therefore, if this court uses the Controlled Substances Act to delineate "controlled substances" offenses under the guidelines, the Georgia statute is not a categorical match according to Eleventh Circuit precedent.

18

Thus, because the state marijuana statute criminalizes more conduct than the federal, Mr. Whatley's Georgia state marijuana adjudication cannot enhance his base offense level. That level should be 20 instead of 22. If the Court were to grant the variance Mr. Whatley requested based on the guidelines amendments and to sustain this objection, his final range would be 63 to 78 months.

Dated:  This 18th day of July, 2023.

Respectfully submitted,

/s/ *Joe Austin*
JOE AUSTIN
GEORGIA STATE BAR NO. 176460
ATTORNEY FOR MR. WHATLEY

Federal Defender Program, Inc.
Suite 1500, Centennial Tower
101 Marietta Street, N.W.
Atlanta, Georgia 30303
(404) 688-7530
Joe_Austin@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Sentencing Memorandum was formatted in Book Antiqua 14 pt., in accordance with Local Rule 5.1B, and was electronically filed this day with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following Assistant United States Attorney of record:

> Mary Webb, Esq.
> Assistant United States Attorney
> 600 Richard B. Russell Building
> 75 Spring Street, S. W.
> Atlanta, Georgia 30303

Dated: This 18th day of July, 2023.

/s/ *Joe Austin*
JOE AUSTIN